Robert E. Grossman (RG-3602)
Kenneth J. Rubinstein (KR-1410)
Schuyler G. Carroll (SG-0100)
OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
505 Park Avenue
New York, New York 10022
(212) 753-7200

Attorneys for H. Park Central, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| H. PARK CENTRAL, LLC, | Case No. 00 B 11755 (PCB) |
| Debtor. | |

-----------------------------------------------------------x

| | |
|---|---|
| H. PARK CENTRAL, LLC, | **COMPLAINT** |
| Plaintiff, | |
| - against - | Adversary No. 00-02862 |
| LEHMAN BROTHERS HOLDINGS, INC., and HATFIELD PHILIPS, INC., | |
| Defendants. | |

-----------------------------------------------------------x

H. Park Central, LLC, debtor/plaintiff and debtor-in-possession (the "Debtor"), by its attorneys, Olshan Grundman Frome Rosenzweig & Wolosky LLP, alleges as follows:

280970.9

**SUMMARY OF CLAIM**

1. In December, 1997, the Debtor borrowed substantial funds from Lehman Brothers Holdings, Inc. ("Lehman") in order to conduct extensive renovations at its premiere hotel property, then known as The Park Central Hotel (the "Hotel"). As a condition to the loan, Lehman required that it assume complete and absolute control over all of the Debtor's cash flow and expenditures. Consistent with this demand, the Debtor was required to, and in fact did, establish a lockbox for all of its income and a reserve escrow account for its capital expenditures. Pursuant to the parties' lockbox agreement, the Debtor and Lehman agreed that the funds received in the lockbox would be applied, in the first instance, to the operating expenses of the Hotel and next, to cover taxes and insurance expenses. Once these expenses had been met, then -- and only then -- would Lehman be permitted to apply funds in the lockbox to reimburse itself for interest and obligations due under the loan agreements. The parties repeated this prioritization of obligations in a variety of forms throughout their loan agreements. In November, 1998, Lehman began to use its control over the Debtor's cash to divert as interest payments to a loan participant funds that were owed to the Debtor's trade creditors and as tax obligations, notwithstanding the ironclad requirements of the loan agreements. From approximately November, 1998 through May, 2000, Lehman thus diverted more than $13 million in proceeds; with these funds, the Debtor would have completed its renovation program on time and on budget. Lehman's unlawful takings threw the Debtor's relations with its trade creditors into shambles, materially delayed the completion of the renovation project, increased the overall cost of the project, and deprived the Debtor of months of revenue and profits that it would have earned on a timely completion. In the end,

Lehman's conduct left the Debtor's trade creditors no recourse but to institute involuntary Chapter 7 proceedings against the Debtor, causing even greater loss to the Debtor. As a result of Lehman's clear breach of its loan agreements, the Debtor has sustained substantial damages.

**THE PARTIES**

2. The Debtor is a New York limited liability company with its principal place of business located at 870 Seventh Avenue, New York, New York.

3. The Debtor owns and operates the Park Central New York, formerly known as The Park Central Hotel (the "Hotel"). The Hotel is located in the condominium known as The Park Central Condominium (the "Condominium"), located at 870 Seventh Avenue, New York, New York. The Condominium stretches the entire blockfront between Fifty-Fifth and Fifty-Sixth Streets on the west side of Seventh Avenue in Manhattan.

4. Upon information and belief, Lehman is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 3 World Financial Center, New York, New York.

5. Upon information and belief, Hatfield Philips Inc., is a corporation organized under the laws of the State of Georgia. As described below, upon information and belief, Hatfield is the successor-in-interest to Crown Northcorp, Inc. (collectively referred to herein as "Hatfield"), and has acted as the agent for and on behalf of Lehman in certain dealings with the Debtor related to the Hotel.

## JURISDICTION AND VENUE

6. Jurisdiction over this civil proceeding is vested in the United States District Court for the Southern District of New York pursuant to Section 1334(b) of Title 28 of the United States Code.

7. Pursuant to Sections 157(a) and 157(b)(1) of Title 28 of the United States Code and the Standing Order of Referral of Cases to Bankruptcy Judges (S.D.N.Y. July 10, 1984) (Ward, Acting C.J.), this civil proceeding has been referred to this Court for proceedings consistent therewith.

8. This civil proceeding arises under and otherwise relates to a case under Title 11 of the United States Code, and pursuant to Section 157(b)(2) of Title 28 of the United States Code, this is a core proceeding.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

### Background

10. In or about August, 1995, the Debtor and certain of its affiliates, as tenants in common, purchased the Condominium from Park Center Associates, a reorganized Chapter 11 debtor. The Condominium consists of two towers (north and south), each rising approximately 25 stories, and a central section, rising approximately 33 stories. It is located in the heart of the Midtown Manhattan West revival, an area that has enjoyed enormous new investment and development, and is unquestionably one of New York City's hottest districts and the home to some of its most exciting real

estate, namely Times Square to the south, the strong office and retail districts to the east, and Columbus Circle and Central Park to the north.

11. The Condominium was later divided into three separate components, consisting of (i) the Hotel, retail and restaurant unit (owned and operated by the Debtor), (ii) common areas and offices, and (iii) time share units known as the Manhattan Club which is owned and operated by an affiliate of the Debtor.

12. The Hotel today offers guests 935 guestrooms and suites and boasts some of Manhattan's most commanding views. The Hotel's bedrooms average 306 square feet with unusually high floor-to-ceiling heights ranging from 9.0 to 10.5 feet. The guestrooms are elegantly designed and offer luxurious soft goods, case goods, and detailed finishes accented with New York City themed artwork.

13. The Hotel occupies the entirety of the south tower, the bottom 12 floors of the north tower and central section, half of the central section from floors 13-25, and the entire mezzanine, lobby and basement areas of the Condominium.

**The Loan Documents**

14. In order to fund an extensive improvement and renovation project, the Debtor entered into a series of agreements with Lehman which included: (a) a Consolidated, Amended and Restated Mortgage Agreement, (b) a Loan Agreement, (c) an Assignment of Leases and Rents, (d) a Security and Lockbox Agreement, (e) a Mortgage Note, and (f) a Repair Escrow Agreement. These agreements were executed on or about December 12, 1997, and are annexed hereto as Exhibits A through F respectively.

15.     Under the Loan Agreement (Exhibit B), Lehman loaned the Debtor a principal amount of $155 million secured by the mortgage lien and security interest in the Hotel, which amount was to be used to refinance the Hotel and to cover the construction costs of the renovation project.  The full amount of principal and interest under the Note (Exhibit E), became due and payable on January 5, 2000, subject to an extension for one year under certain circumstances.

16.     Pursuant to the Consolidated, Amended and Restated Mortgage ("Mortgage Agreement," Exhibit A), the Debtor granted Lehman liens in all of the Debtor's interest in the Hotel which, collectively with the Debtor's interest in the improvements and certain other property, comprised the Mortgaged Property (as such term is defined in the Mortgage Agreement), including all leases, rents, room occupancy and related charges, and other proceeds (collectively, the "Rents").  Under the Assignment of Leases and Rents (Exhibit C), Debtor assigned to Lehman, among other things, all of the Debtor's rights and interests in all current and future Rents with respect to the Property.

17.     The Debtor and Lehman also entered into a Security and Lockbox Agreement (the "Lockbox Agreement," Exhibit D), which provided additional security for the loan.  The Lockbox Agreement also evidenced obligations of the Debtor to maintain certain cash management arrangements, and granted certain liens to Lehman in connection therewith.  Under the Lockbox Agreement, Hatfield acted as the agent for and on behalf of Lehman, and was also a signatory to the agreement.  The lockbox was established in the name of Hatfield, as servicer of the lockbox, into which all Rents and other revenue derived from the Hotel were deposited.

18.     In the Repair Escrow Agreement (Exhibit F), Debtor and Lehman set aside $65 million as a "Repair Escrow Account" for the renovation project. These funds were subject to the terms set forth in the Loan Agreement. Essentially, they were committed to be used as a construction loan for the renovation project.

19.     Upon information and belief, shortly after the loan documents were executed, unbeknownst to the Debtor, Lehman entered into a Loan Participation Agreement, dated as of June 15, 1998 (the "Participation Agreement"), with Bayerische Hypotheken-Und Wechsel-Bank, AG (the "Participant"). Under this Participation Agreement, Lehman sold to the Participant an undivided senior participation interest in the Note and other Loan Documents. As set forth below, the terms of the Participation Agreement placed enormous financial pressure on Lehman to prefer itself over the Debtor's renovation and trade creditors.

**The Renovation Project**

20.     After the loan documents closed, in or about January, 1998, the Debtor embarked on an extensive renovation and refurbishing project with the aim of upgrading the Hotel to a three-and-a-half star establishment. The renovation/ refurbishing project consisted of: (i) improving the Hotel's facade, (ii) upgrading the Hotel's infrastructure (i.e., HVAC, electrical, plumbing, fire alarm and sprinkler systems), (iii) reconfiguring the Hotel's lobby with new finishes, fixtures and lighting scheme, and heightened ceilings, combined with the creation of a new bar area, renovation/ expansion of the existing restaurant space, and relocation of some of the existing retail space, (iv) replacing the elevator cabs in all of the Hotel's passenger

elevators, and installing new controls and/or motors in the Hotel's freight elevators, (v) providing new ceilings, walls, carpet, electrical fixtures, paint, wall coverings, and plumbing to the Hotel's guest rooms, bathrooms, and corridors, and (vi) upgrading and expanding the Hotel's meeting rooms. In addition, all of the renovated guest rooms were provided with new furniture and drapes, shades, curtains, and bedspreads (hereinafter referred to as the "Renovation Project").

21. As presented to and accepted by Lehman, the budget of estimated expenses for the Renovation Project totaled approximately $60 million. Pursuant to the Loan Documents, this amount was to be set aside for the Renovation Project as the Repair Escrow Account, subject to the Repair Escrow Agreement.

22. While the Renovation Project was underway, it was contemplated that the Debtor would continue to operate substantial portions of the Hotel.

**Priorities Established by the Loan Documents**

23. All parties recognized that the amounts set aside in the Repair Escrow Account might be insufficient to complete the Renovation Project. In the event of a shortfall, the parties therefore agreed to a strict priority of payment that would first fund the Debtor's operating expenses; second, pay its insurance and taxes; and third, repay its obligations to Lehman. In addition, the parties recognized that upon an "Event of Default" under the loan, a similar strict prioritization would occur.

24. As set forth above, all of the Debtor's income was to be directed to a lockbox. The priority of obligations to be satisfied from these funds by Lehman was set forth in the Loan Agreement, and restated in the Lockbox Agreement, as follows:

>    (a)  All gross income derived from the Mortgaged Property (other than proceeds of a Capital Event) shall be paid directly into the Lockbox Account.  On a monthly basis, or more frequently if dictated by specific circumstances, Servicer shall release funds held in the Lockbox Account for distribution to the Accounts and otherwise in accordance with the Budget in the following order of priority:
>
>    (i)  <u>first</u>, to fund the Operating Expense Account;
>
>    (ii)  <u>next</u>, the balance, if any, to fund the Tax and Insurance Escrow Account;
>
>    (iii)  <u>next, the balance, if any, to reimburse Lender</u> (to the extent Lender is entitled to such reimbursement under the Loan Documents) for any unpaid costs and expenses incurred by Lender on Borrower's behalf or in the enforcement of Lender's rights hereunder;
>
>    *       *       *
>
>    (viii) next, the balance, if any, to reduce the outstanding principal balance of the Loan to $150,000,000.00; and
>
>    (ix) 100% of the balance, if any, to Borrower.

(Ex. B, ¶ 2; Ex. D, ¶ 5) (emphasis added).

25. The Repair Escrow Agreement similarly reflected the parties' understanding that repairs and operations had a priority over repayment of debt.  It provided for payment of expenses related to the Renovation Project from the Repair Escrow Account as follows:

> <u>Use of the Repair Escrow</u>.  Except as otherwise provided in this Agreement and the Loan Agreement, <u>the Repair Escrow shall be used exclusively in respect of the Repairs</u> and, to the extent set forth in the Loan Agreement, in respect of the payment of interest on the Loan.  Disbursements from the Repair Escrow to pay interest on the Loan under the circumstances contemplated by the Loan Agreement may be made by or on behalf of Lender and shall not require a Request for Release from Borrower or satisfaction of the other conditions for releases provided herein.

(Ex. F, ¶ 3) (emphasis added). The Loan Agreement permitted no more than $5 million to be deducted from this special account to pay interest. (Ex. B, ¶ 2(a)(iv)).

26. The Repair Escrow Agreement also provided that, in the event of default, the costs of the Renovation Project became a priority to other amounts. It provides as follows:

> Lender [Lehman], in its sole and absolute discretion, may, <u>except in respect of funds needed to pay for work already performed under an approved contract or a contract for which approval is not required</u> . . .

(Ex. F, ¶ 10) (emphasis added).

27. The Loan Documents further confirmed the priority structure by providing that, should an event of default occur, Lehman would become obligated to apply all funds received to payment of the operating expenses, taxes, and Renovation Project expenses, even in the event that full debt service was not paid. Paragraph 65 of the Loan Agreement states:

> <u>Payment of Operating Expenses After Default</u>
>
> Anything herein or in the other Loan Documents to the contrary notwithstanding, <u>upon the occurrence and during the continuance of an Event of Default</u> hereunder or under any of the other Loan Documents, until Borrower's interest in the Mortgaged Property has been extinguished or forfeited by foreclosure, deed in lieu of foreclosure or similar transaction, <u>Lender shall apply income and proceeds from the Mortgaged Property to the payment of Taxes, Insurance and other operating expenses in respect of the Mortgaged Property prior to applying such income and proceeds to the payment of the Debt</u>.

(Ex. B, ¶ 65) (emphasis added). The Loan Agreement defined "Expenses" broadly as:

> Taxes and Other Charges . . . sales, use and personal property taxes . . . management fees payable under the Management Agreement . . . wages, salaries, pension costs and all fringe and other employee-related benefits and

280970.9  10

>       expenses . . . the cost of utilities, and all other
>       administrative, management, ownership, operating, leasing
>       and maintenance expenses incurred in connection with the
>       operation of the Mortgaged Property . . .

(Ex. B, ¶ 1(v)).

**The Lockbox**

28.     Pursuant to the Lockbox Agreement, a lockbox was indeed established into which all of the income, receipts, and accounts of the Hotel were deposited, and Hatfield, as servicer for Lehman, became responsible for paying, among other things, the Hotel's operating expenses and taxes.

29.     At all times, in accordance with the terms and conditions of the Loan Documents, Lehman and Hatfield controlled the contents of the lockbox, including funds, income, and receipts derived from the Hotel, which were directly deposited into the lockbox. The Lockbox Agreement provided that Hatfield "shall have sole and exclusive dominion and control over the Repair Escrow Account, all funds held therein and all proceeds thereof . . ."  (Ex. D, ¶ 9)

30.     The Debtor submitted to Hatfield line-item expense requests that were due and owing and, on several occasions, specifically requested that Lehman pay these bills so that the Renovation Project could continue.  The Debtor was never in control of the proceeds or funds received from the Hotel as that money, and all Hotel receipts, were placed directly into the lockbox.

**The Repair Escrow**

31. Pursuant to the Repair Escrow Agreement, a "Repair Escrow Account" was likewise established to fund the Renovation Program. The Repair Escrow Agreement required that this account be funded with $65 million. The estimated budget for the renovations was approximately $60 million; approximately $5 million was added to the Repair Escrow Account as an interest reserve.

32. Notwithstanding the budget for the Renovation Project and the terms of the Loan Documents, Lehman deposited approximately $58 million into the Repair Escrow Account, charging approximately $7 million in closing costs to this account.

33. Notwithstanding these $7 million in charges, Lehman continued to apply funds in this reserve to interest payments.

**Lehman's Breach Of The Loan Agreements**

34. Because Lehman had charged all closing costs on the loan to the Repair Escrow Account, a shortfall loomed as a serious possibility. Under the Loan Documents, when this shortfall arose, Lehman became obligated to pay from the lockbox the costs of the Renovation Project.

35. Notwithstanding the provisions in the Loan Documents, beginning in or about November, 1998, Lehman began to apply lockbox funds to the payment of debt service as a priority to the Debtor's operating expenses, taxes and Renovation Project expenses.

36. In addition, in or about November, 1998, according to Lehman an event of default occurred, giving rise to an obligation on the part of the Debtor to pay "default interest" on the loan. However, such an event of default also triggered strict obligations

on the part of Lehman.  Paragraph 10 of the Repair Escrow Agreement (Ex. F) provides in pertinent part:

> If an Event of Default has occurred and is continuing, then Lender, in its sole and absolute discretion, may, except in respect of funds needed to pay for work already performed under an approved contract or a contract for which approval is not required: (i) apply all or any portion of the Repair Escrow to payment of the indebtedness evidenced by the Note or any unpaid fees, costs or expenses that Borrower is required to pay under this Agreement or under any of the other Loan Documents (<u>provided</u>, <u>however</u>, that such application of funds shall not cure or be deemed to cure any such default); (ii) apply the funds in the Repair Escrow to reimburse Lender for any losses or expenses (including, without limitation, attorneys' fees) suffered or incurred by Lender as a result of such default; (iii) apply the funds in the Repair Escrow to make or complete the Repairs as provided in Section 2 hereof; or (iv) apply the funds in the Repair Escrow in connection with the exercise of any rights and remedies available to Lender at law or in equity, under this Agreement or any other Loan Document.

37. In November, 1998, substantially all of the contracts for the renovations had been issued and work was being performed.  Notwithstanding the above limitation, Lehman continued to pay itself interest from the Repair Escrow Account.

38. Moreover, paragraph 65 of the Loan Agreement was just as clear regarding Lehman's limited rights to use the Debtor's funds after November, 1998:

> Anything herein or in the other Loan Documents to the contrary notwithstanding, <u>upon the occurrence and during the continuance of an Event of Default</u> hereunder or under any of the other Loan Documents, until Borrower's interest in the Mortgaged Property has been extinguished or forfeited by foreclosure, deed in lieu of foreclosure or similar transaction, <u>Lender shall apply income and proceeds from the Mortgaged Property to the payment of Taxes, Insurance and other operating expenses in respect of the Mortgaged Property prior to applying such income and proceeds to the payment of the Debt</u>.

280970.9                                      13

(Ex. B, ¶ 65) (emphasis added).

39. Upon information and belief, over approximately the next 18 months, Lehman diverted approximately $13 million from the lockbox and/or the Repair Escrow Account, which should have been used to pay the Hotel's operating and capital expenses, and taxes, but which Lehman paid to itself and/or to the Participant.

40. The approximately $13 million Lehman paid itself or the Participant is nearly the exact amount which, if paid -- as required under the Loan Documents -- would have covered the expenses and taxes due on the Hotel and thereby would have prevented any default by the Debtor to its contractors and the Debtor from being placed into involuntary bankruptcy.

41. Due in large part to Lehman's failure to make timely payments to vendors, the Renovation Project was delayed. And, due to the Debtor's inability to fully utilize the Hotel due to the incomplete renovations, the Debtor was unable to generate sufficient cash flow to meet all of its obligations. Moreover, the amount owed by the Debtor to Lehman was escalated as a result of Lehman's failures to make timely payments on the Renovation Project.

42. As a direct result of the payments made by Lehman for its debt service, the Debtor was thus unable to pay all of its ongoing expenses, including those related to the Renovation Project, trade vendors, and debt service.

43. The work on the Renovation Project was expected to be completed in or about July, 1999. However, it was actually completed in or about September, 1999, a delay directly attributable to Lehman's actions. Indeed, the Renovation Project was

completed *on budget*, when expenses and costs which are directly attributable to Lehman's delays and self-interest are considered.

44. As a direct result of Lehman's improper diversion of funds from the lockbox and/or Repair Escrow Account, the Debtor was not able to complete all payments to trade vendors and for Renovation Project expenses. Accordingly, numerous contractors who had performed work on the Hotel were not paid, and a single contractor organized a group that placed the Debtor into an involuntary bankruptcy.

45. On April 25, 2000, several mechanic's lienholders commenced a Bankruptcy Case against Debtor by filing with the Bankruptcy Court an involuntary petition for relief under Chapter 7 of the Bankruptcy Code.

46. As of the Filing Date, substantially all of the Debtor's assets were pledged to or encumbered by third parties.

47. Upon information and belief, Lehman diverted the funds owed for Hotel expenses and taxes, in order to avoid the onerous obligations under the Participation Agreement. The Participation Agreement entitled the Participant to put to Lehman its $85 million participation interest in the event that the Debtor failed to make timely interest payments. In order to avoid the staggering cost of this put, Lehman simply elected to continue making interest payments, using the Debtor's funds that had, by agreement, been allocated to the Renovation Project, to the operation of the Hotel, and to taxes and insurance expenses.

48. As a result of Lehman's actions, the Debtor has suffered substantial damages.

**Lehman's Demand For Additional Interest**

49. Lehman has demanded "Additional Interest" in the amount of $20,000,000, in reliance on paragraph 61 of the Loan Agreement (Ex. B) which provides, in pertinent part:

> Upon the first Capital Event . . . Lender shall be entitled to, as additional interest on the Loan, and in addition to any sums otherwise payable in accordance with the Loan Documents: (i) $20,000,000, less an amount equal to the aggregate sum paid to Lender under Section 2(a)(viii) hereof; and (ii) 50% of the Net Equity calculated as of the date of such Capital Event . . . (the "Additional Interest").

50. First, Lehman has erroneously asserted that the maturity of the loan gives rise to a claim for Additional Interest.

51. Second, Lehman claims that the Debtor was in default as of the maturity of the loan -- January 5, 2000 – and therefore, was not able to extend the loan's maturity for one year pursuant to paragraph 1 (b) of the Mortgage Note (Ex. E).

52. However, due to Lehman's conduct the Debtor was deprived of its contractual right to extend the maturity of the loan for one year. If the Debtor had retained its contractual right to extend the loan for one year, it would have had the option to sell the Mortgaged Property or refinance the loan and thereby would not have been forced to pay Additional Interest in cash but rather, as set forth in paragraph 61 of the Loan Agreement, would have been able to subordinate the debt through a note which would have had an indefinite or extended maturity date. Alternatively, Lehman's diversion of funds caused severe problems for the project and thereby precluded the option to the Debtor of refinancing even prior to the maturity date of the loan.

53. As a result of Lehman's deprivation of the Debtor's contractual rights, Lehman is not entitled to any payment as Additional Interest.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

54. The Debtor repeats the allegations contained in paragraphs 1 through 53 above as if fully set forth herein.

55. Under the Loan Documents, Lehman and Hatfield were responsible for paying, among other things, the operating expenses and taxes on the Hotel, and the Renovation Project expenses.

56. In breach of the Loan Documents, Lehman and Hatfield failed to pay such expenses and taxes as required.

57. As a direct and proximate result of Lehman's and Hatfield's breach of the Loan Documents, the Debtor has suffered damages, in an amount to be determined at trial, but in no event less than $100,000,000.00.

### SECOND CAUSE OF ACTION: FOR DECLARATORY RELIEF

58. The Debtor repeats the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

59. The Debtor is entitled to an order declaring that it is not obligated to Lehman in any amount as payment for "additional interest."

**WHEREFORE,** the Debtor respectfully requests that the Court enter judgment as follows:

(a) On the First Cause of Action for Lehman's and Hatfield's breach of the Loan Documents, in an amount to be determined at trial, but in no event less than $100,000,000.00;

(b) On the Second Cause of Action for Declaratory Relief, for an order declaring that the Debtor is not obligated to Lehman in any amounts as payment for "additional interest";

(c) On all causes of action, an award for costs and expenses, including attorney's fees; and

(d) For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 30, 2000

                OLSHAN GRUNDMAN FROME
                ROSENZWEIG & WOLOSKY LLP


                By:     /s/ Robert E. Grossman
                     Robert E. Grossman (RG-3602)
                     Kenneth J. Rubinstein (KR-1410)
                     Schuyler G. Carroll (SG-0100)
                     505 Park Avenue
                     New York, New York 10022
                     (212) 753-7200

                     Attorneys for Debtor/Plaintiff
                     H. Park Central, LLC